The United States Court of Appeals for the Ninth Circuit is now in session. Telecommissioner Peter Elshaw reciting. Good afternoon or good morning as the case may be. This is the hearing in In Re. Stephen Carl Woodruff, Ninth Circuit, No. 13-800-77. This hearing is the one requested by Mr. Woodruff concerning whether the Ninth Circuit should impose reciprocal discipline based on his disbarment by the Supreme Court of the Commonwealth of the Northern Mariana Islands. We are convening this hearing from San Francisco by videoconference for the convenience of the Court and Mr. Woodruff. It is being conducted on March 28th in San Francisco. I believe it's Wednesday, March 29th, where you are. Is that correct? That is correct, Your Honor. Good afternoon to you. All right. And so in San Francisco, I will be presiding. I have my law clerk, Ed Schiffer, and my courtroom deputy, Juanita Alvarez, here. And so before we begin, Mr. Woodruff, because I'm going to be asking you some questions and we are recording this proceeding so there will be a record of it, I'm going to have my courtroom deputy administer the oath. Raise your right hand, please. Do you solemnly affirm that the statements you are about to make, in this case now before this Court, will be the truth, the whole truth, and nothing but the truth, and this you do under the pains and penalties of perjury? Yes, I do. Please state your full name for the record. My name is Stephen Carl Woodruff. That's Stephen with a P-H and Carl with a C. All right. So, Mr. Woodruff, I know you understand the inquiry here today, and that is we are governed by a restricted standard of review in which ordinarily the Court will respect a disciplinary action taken by a state or the Commonwealth in this case, unless the respondent, the discipline attorney, can carry the burden of showing by clear and convincing evidence one of three factors, either that there was a lack of due process, notice of an opportunity to be heard, or that there was something insufficient about the facts supporting the decision, or third, that some other grave reason would prevent the Court, or should prevent the Court, from respecting the decision made by the Supreme Court. You have submitted a volume of materials, almost all of which I have reviewed, and I see that you understand the nature of the inquiry, and so I want to assure you that we have read and studied your submissions, so I don't expect you to review everything that you've submitted, but it is a hearing that you are entitled to, and so I want to give you some ability to make your most salient points, and I will have some questions for you as well, but before we begin, maybe you can give me an idea of how you propose to proceed today. Well, most importantly, I want to answer whatever concerns and questions your Honor has after having you have the opportunity to review, but from my perspective, the entire process in the CNMI was fundamentally unfair, beginning at the disciplinary committee stage, and we have a situation where there is actually no occasion where a complaining party made any kind of declaration under oath. There are just no sworn statements at all in the record, aside from the fact that this was a default judgment, even though I was attempting to defend myself, which that is the concern. And, you know, I think it's close to 150 years ago that the Supreme Court in the next part they heard said that a complaint against a lawyer needs at the minimum to be based on sworn testimony. Now, a lot has passed since in the past 150 years, but I do think that there has to be some kind of basis to support what was being alleged against me, and I'm not saying that I did everything right. That's the most important point, and I get treated sometimes in hearings that we had as if I'm blaming other people or denying that I didn't have any errors. I mean, I did have errors, and I did have things that needed to be corrected. And in point of fact, if the disciplinary committee had done its job the way that the rules provide for it to do its job, and that's a due process right to find. If they had done that job the way that they were supposed to, we never would have gotten to that point, and there certainly never would have been a disarmament. And I argue also that disarmament isn't even appropriate on the facts alleged in the first amended complaint, although there are problems with that, and we can get into a lot of complicated arguments and differences of opinion with regard to that. But when we go back to the disciplinary committee, which the commonwealth supreme court said is supposed to end the Zana case, which the court doesn't have that, but they said that the function of the disciplinary committee is to do a screening process so that things have an initial review before they get to the court. And the disciplinary committee didn't do that properly. We have five years of complaints, a number of complaints, that the disciplinary committee put forward, and six years of conduct implicated inside of that framework. Mr. Bellis came out and alleged that I didn't respond to or cooperate with the investigation. That is absolutely false. I actually prepared a declaration, but I wasn't able to finish it before the extended deadline because my laptop just went crazy at that time. But I actually prepared a lengthy declaration demonstrating how mendacious disciplinary committee chairman Bellis' conduct was in the interim suspension proceeding. And so we start with this aggregation. The first person on the disciplinary committee investigating complaints against me was Janet King. And she had at least four, maybe five of the complaints were investigated by her. She never indicated that she was going to recommend prosecution of any of them. I responded to her. I gave her all the information. In the Warhol case, I clearly demonstrated that there was no deficiency on my part, and that is also included in the materials that were provided to Your Honor. And years passed. And every time something came up, I responded promptly. And my conclusion or understanding was that nothing was going to be prosecuted because of this. But then we get at the end of the process, and all of a sudden, Janet King is leading the disciplinary committee. The composition of the disciplinary committee changes. All of a sudden, they do multiple reports all at one time and recommend prosecution on all of them and come up with this allegation of pattern of misconduct, which had never been suggested to me before. And I never had a chance to present any argument about that or any evidence to counter pattern allegations. And the next thing I know, they come flying into the Supreme Court. The disciplinary committee does not have any authorization under the rules to bring an interim suspension action in the Supreme Court. The Supreme Court itself in the case had ruled that the superior court could not impose a suspicion on an attorney without following the disciplinary rules. So, why should the Supreme Court be exempt from that same standard? But very importantly is that this disciplinary committee does not have any authority to prosecute attorneys. The rules require that when they believe that something should be prosecuted, it is to be referred to the superior court presiding judge and the chief justice of the Supreme Court. And that the court appoints an independent prosecutor who was then supposed to be taking an independent look at what the disciplinary committee had done and then decide whether and how to prosecute. Once that wasn't done, the chairman came into the Supreme Court and did, in this totally unprecedented and unauthorized interim suspension proceeding, and I was given very little time to respond in that proceeding. Basically, I was well-rooted through that proceeding. I was on February 1st of 2013. I was immediately suspended from practice of law. Now, the rules say that there is a 30-day winding up period and all of that so that there is some order to what happens. But no, that is not what happened. I was immediately suspended from practice of law. I had 97 active clients at that time. My law practice was thrown into complete and utter chaos. I had clients asking what was going to happen. I had many cases in immigration court. So the first thing I had to do the very day that I was served with—not the very day, the next day, because it was on a Friday at 5 p.m. when I was served, which was fortunately only Thursday in the mainland, in Honolulu. On Friday at 5 p.m. I was served with a decision and order immediately suspending me from practice of law. So the first thing I did on Saturday morning was to write a letter to the immigration judge in Honolulu informing him of the situation and providing a copy of the order and saying, you know, next week I have these hearings in immigration court here on Saipan. What should I do? I went to him and asked him for guidance. Well, he didn't actually respond to that letter, which I faxed with permission to immigration court in Honolulu. And so I went to immigration court when the next hearing was scheduled, prepared to proceed, and I asked him face-to-face there whether I should proceed or not. And he instructed me to proceed, and thereafter I conducted myself consistent with the order of the Supreme Court, but consistent also with the independent jurisdiction of the federal government. Now, that situation is actually part of the reason why we ended up with a default in the Superior Court. And then we had a conflicted disciplinary counsel in the Superior Court, which at first I thought would conduct himself professionally despite the conduct, but that turned out not to be the case. We had a conflicted disciplinary counsel in the Superior Court refusing to set aside the default because of confusion about the date. Now, I think that that kind of gives a sense of, I mean, I could go on at length about the various details of the way that I was denied the process that I was actually due. But the disciplinary committee and then the Superior Court judge, not only did he refuse to set aside the default, and I believe that on the Ninth Circuit standards for setting aside the default, it is pretty clear that I had the necessary show. I don't have to show that I can prevail on every single charge. I don't have to show that I will definitely prevail. I only have to show that I have a meritorious defense, that there's the potential that I can prevail. And, you know, I had a declaration from Esperanza Alas. Excuse me. Absolutely. You can interrupt me at any time. Right, right. Because you got to a point. So, I'm particularly interested in this point that you contend that you have a meritorious defense. So, what I'd like to do is just go through the nine cases that were alleged in the First Amendment complaint and have you note for us that the potential meritorious defense that you had at the time that you filed the application for a leak from default. Okay. What I'd like for you to do is identify what you had provided at the time, and then if you have other explanations that you weren't able to provide at the time, but that you now have available, I'll let you do that. So, let's begin with Warfel's. Hold on a second. Oh, okay. Okay. So, with the Warfel's case, I'm somewhat familiar with the facts of these cases, but why don't you tell me what your meritorious defense was there? And what did you provide at the time to the judge? I guess it was Judge Wiseman at the time as a potential meritorious defense in that case. In the Warfel case, I did not include anything. Your Honor needs to understand that I had essentially only overnight to prepare the motion for release from default because I didn't know that the default had been entered. And then I got a last-minute notice that a default judgment hearing was going to be held, and the only thing that I could do was rush to prepare what I could to set aside the entry of default. And then I went into court, and if you look at the transcript, you can see that Judge Wiseman met my motion to set aside the default with hostility. When did you get notice of the default? Let's see. I don't remember right now. I think it appears in the transcript. Just a moment. I think we have it then. Right, end of March. It's docket number 37-2, and March 14, 2013 default hearing starts on page 56 of that entry. Let's see. Okay, but you say it was one day. You learned about it the day before the hearing? Right now, I'm trying to remember exactly when I got service, but there was a weekend there. Let's see. Okay. First of all, that's... Let's see. I think in my brief to the Supreme Court, I also said something about that, but... Well, I don't want to get, you know, spend too much time on this point. It's not that important. But if you had had time to respond about Lorchel's, what would you have, what would your meritorious defense be? Well, I would have pointed out the whole matter of the investigation with Janet King. Most importantly, there were several allegations there. Mr. Clifford, when he fled the First Amendment complaint, he accused me of failure to communicate in just about every case, which that just wasn't true. But in the Lorchel's case, they put in several things. There was a matter about a check that couldn't be honored and something about the date that it was received by the USCIS. And those things didn't have anything to do with that, whether I did my job or I didn't do my job. You know, I'm not maintaining the Lorchel's bank account. And those things, to my best recollection, had not even been brought up during the investigation by Janet King. Those are like padding that Mr. Lorchel added. The key issue in the Lorchel case was the issue of the abandonment denial as a result of their not showing up at the interview. And I had been in communication with Mr. Lorchel's wife, who was living here on Saipemba. He's out working on a ship. And she had asked me to contact USCIS on Guam to have the interview rescheduled. This is something that you ordinarily can do fairly easily. And I contacted them. And I provided Janet King. And it's in the one... I'm not sure which docket number right now, but it's called... The document itself is called Appeal-10 because I filed it in the CNMI Supreme Court. And it had a lot of emails and documents that related to the investigation of these matters. I can interrupt you for a moment. First of all, just sort of to make the record here, was this Appeal-10 exhibit part of the record of the Supreme Court proceedings? Was it? It was one of my exhibits to my motion to disqualify Mr. Clifford and state proceedings and for appointment of an appeal conference office. Was it part of the record? Was this admitted? Was this actually accepted by the Supreme Court as part of the record that they considered? This is not one of the late excerpts. Yes, it was. But it wasn't part of the appellate record itself. It was part of the motion when I asked the Supreme Court to disqualify disciplinary counsel, state proceedings, and appoint an appeal conference officer, which they, I think, did a short stay in while they determined whether to disqualify Mr. Clifford. And they did disqualify Mr. Clifford. All right. So in this document, I saw, I think, I saw in the e-mails or a report or something that you were asked for evidence of a letter that you had sent to USCIS in Guam requesting rescheduling. And this report, I forget whether it was by Janet King or by the, was it Thales? What's his name? One or the other, that you were unable to provide a letter to the USCIS in Guam to corroborate your explanation to them that you had, in fact, sent a letter on behalf of the Warhols. But I think I also saw in here a copy of a letter to USCIS from 2008. Can you explain why there's that discrepancy? Well, I'm not sure. I don't actually remember reading in the Warhol report by Janet King, and it was by Janet King. I don't remember reading in there her saying that I had been unable to supply a copy of the letter, because my recollection is that I did supply the copy of the letter. The copy of the letter is in there. And the, but you know the inter- Well, actually, that's getting ahead of ourselves. The, let me just. So I don't know why Ms. King would have been saying that. But one important thing, Your Honor, is that those reports by the investigating attorney to the disciplinary committee, I never had an opportunity to see those until Mr. Ellis decided what he was going to put into the interim suspension proceeding. And so if he supplied something as an exhibit in the interim suspension proceeding, that was the first opportunity I ever had to see it. So frankly, I'm not sure I ever read Ms. King's report in Warhol very carefully, because I never saw it before January of 2013. Is it your, did you recall whether or not you provided that letter to her during what she asked for? Your Honor, my recollection is that, I don't have a clear recollection of doing that, but my recollection is that yes, I did provide that. But I would have to go back and re-examine those emails and see whether I specifically referenced it in one of those emails. I can't think of any reason why I would not have provided it to her. I most certainly included it in that exhibit. Well, I can't put my hands on it right now, but all right. So, and then what happened in Warhol's, there's some discussion about ultimately a lawsuit against you and then a potential settlement. What happened at the end of the day? Well, at the end of the day, it was covered by Judge Weiss' disorder. And at the end of the day, it was part of the disciplinary case. And at the end of the day, the same amount of money that I had, I had agreed to refund the $600. In the small claims case that Mr. Clifford filed against me, I had agreed to refund the $600 attorney's fee that they had paid. And the Warhols would withdraw their complaint from the disciplinary committee, which wouldn't have stopped the disciplinary committee from proceeding if they wanted to. But that was what we had agreed to. But it was never finalized before Mr. Clifford brought the disciplinary case against me. So, is there any... They got the benefit of the settlement, but I got nailed disciplinarily as well. So, you paid them $600 back? Yes, it was actually paid through the court in connection with the disciplinary case. But they did get their money back. Okay, let's move on to Ambrosio Dain. It's buying. Buying. Buying, yes. Thank you for correcting me. Yes. And this is the labor case. And according to the allegations in the First Amendment complaint, you filed a handwritten appeal saying more documents would be submitted, but none were. And then there was an allegation that Bain was largely unsuccessful in communicating with you through the last... or 2007 through the first nine months of 2008. And evidently, you told the investigating attorney that you had not filed anything for Bain because the appeal was undertaken to allow Bain to remain in the Commonwealth during the appeal. So, that was the allegation. What was your meritorious defense to that? Well, the statement that I, which Mr. Bellis did in the interim suspension hearing also, and I'm not sure about the report written by Janet King because I don't think I've ever seen that report. Mr. Bellis took the position that I'm not entitled to see any of those things. And I take the position that as a matter of due process, I was entitled to see all of those documents and have an opportunity to review and respond to them. At the disciplinary committee level, it's certainly at the trial court level, even if not at the disciplinary committee level. But it is not true that I admitted to the investigating attorney that there was an improper purpose for that appeal. And that's basically what they're saying. The fact of the matter is that that was an appeal from an order of a hearing officer in the Department of Labor that denied Mr. Bain transfer relief. Transfer relief is the means at that time by which a former worker in the CNMI would be able to find a new employer and continue to stay in the CNMI, which is what Mr. Bain wanted to do. And that is what I told the investigating attorney. The investigating attorney actually got – and I think that also appears in the communications in the exhibit Appeal-10. They kept getting confused about who I represented, whether Kinship Enterprises or Mr. Bain. And they had communications with the acting secretary of labor, who was equally confused as them. But the essential facts are, it's a perfectly legitimate appeal. Mr. Bain was denied transfer relief. And we appealed the hearing officer's decision that he was denied transfer relief, to try to get him transfer relief. Now, under CNMI law, if you have a pending appeal, you're able to continue to stay. All I pointed out to Ms. King was that there was no prejudice of any kind to Mr. Bain. And I took on – essentially took on Mr. Bain's case for office. He paid me $50, $25 of which was to pay the appeal fee, which was paid. And the other $25 was just a little something for office overhead. But my work was free on that case. What about the allegation that he was unsuccessful in communicating with you for a period of approximately 10 months? Well, if you notice how artfully that was written, it says that he wasn't able to communicate with me. He wasn't able to get a meaningful response. He wasn't able to communicate with me directly. It may be right that he never spoke directly with me during those 10 months. I'm not sure about that. At that time, I had a secretary and a paralegal, both of whom worked in my outer office. And they would deal with people that were coming in and had questions and give them their responses. And they would advise me of who had inquiries and so on. And I would advise them of the information to pass on to that individual. Mr. Bain never had any trouble whatsoever communicating with my office. And there was no information to supply to him except for the fact that his appeal was still pending with the secretary. Now, my performance was not perfect in that case. I was certainly deficient. I should have filed a written document with the secretary of labor, you know, two, three pages or whatever or something, in that case, saying something more about the case. My only point to the disciplinary investigator was that there was no prejudice to Mr. Bain from the fact that I failed to do that. But, yes, I did fail to do that. And should I have been called to account for that? I agree I should be called to account for that. Should I be debarred this far for that? That's absolutely preposterous to say that I should be disbarred because in that single case I didn't file a short document, additional document, with the secretary of labor. That's my fault, you know, and I'd better say it otherwise. That's the other thing that really bothers me about these proceedings is that time and time again I'm accused of not taking responsibility, even though, in point of fact, time and time again I always acknowledge what was factually true and what was factually deficient in my performance. But, you know, the ears were closed on that one. The ears were only open to find something where they could attack it in some way. Let's move on to Honorio Cambronero. This is the one with the labor action, and I guess it was a labor action and a civil action against the RJCL Corporation and District Court. And it's actually R&D Corporation, Your Honor, and the Cambronero case, Mr. Cambronero had a heart condition. And he went to the, and stand to my labor law and made employers responsible for the, at that time, made employers responsible for the medical expenses of their workers. And Mr. Cambronero went to the Philippines, and then he was trying to, and then he saw a doctor in the Philippines, and the doctor in the Philippines said that he needed to have a stent put in or something like that. I don't remember exactly what. And Mr. Cambronero contacted his employer and said, I need $10,000 for this operation in the Philippines. Now, the employer argued that Mr. Cambronero, and actually, ultimately, the evidence developed by the employer's defense attorney tended to support that position, that really Mr. Cambronero was trying to shake down the employer. Well, then, when Mr. Cambronero came to me and asked me for help with that case, I was concerned about Commonwealth employers trying to shirk their responsibilities for medical and health care of their workers. This is a longstanding problem. And Mr. Cambronero's case looked like one of those cases, and a good one to establish the responsibilities of the employer. And he's asking me for help. And he said, I don't have money. And I said, well, okay, you'll pay me $100 so that you're contributing something to your case. And I go, take on your case for one purpose only, to get your employer to pay the $10,000 for your heart surgery directly to the hospital in the Philippines. Now, the employer had his own reasons, and so I won't get into that. But the employer was really quite angry with Mr. Cambronero for his conduct. So the employer was very stubborn. I talked with the employer. But he absolutely was adamant that he wasn't going to pay anything. He wasn't even going to agree to the terms that I had told Mr. Cambronero were a condition of the representation. And so in order to try to establish precedent and to enforce this right and to assist Mr. Cambronero and to hopefully recover something monetarily for my time, we filed a complaint in federal court with both federal and local causes of action. And the defense attorney, Mr. Das, deposed Mr. Cambronero. And the results of the deposition were not very favorable to Mr. Cambronero. Combined with the affidavit that was produced by the employer with regard to what the employer had actually tried to do and what was really going on in the Philippines. And then there were some legal arguments that were also involved. So Mr. Das filed a summary judgment motion in the federal court here. And when I reviewed the summary judgment motion, I concluded that I couldn't properly oppose it. I couldn't provide a good-faith opposition, fact and law, to that summary judgment motion on the federal claims. So I did what I'm supposed to do in a situation like that. I filed with the court a short memorandum that said that I can't oppose those claims, but I want the local claims, the supplemental jurisdiction claims, to be preserved. Well, Judge Monson didn't like that idea. And Judge Monson exercised his discretion to dismiss the entire lawsuit, and we lost the local claims. It said in the first amendment complaint that it was dismissed after you failed to appear for the summary judgment hearing. That's the Feliciano case. The failure to appear is the Feliciano case. So I thought it said in the summary judgment that you didn't appear in the summary judgment hearing. Hang on. Let me make sure I'm not missing something here. It said, according to the first amendment complaint in paragraph 31, Mr. Woodruff did not file any sensitive opposition in support of the commonwealth claims, nor did he attend a hearing of the motion. As a result, the court in the federal case deemed the entire motion for summary judgment unopposed, granted the motion in its entirety, entered judgment in favor of the defendants, and awarded them costs. That's paragraph 31 and 32 of the first amendment complaint. Well, Your Honor, I don't recall that being the case. Mr. Dodds's summary judgment motion was focused on the federal claims. Now, I haven't gone back and reviewed all of that right now, so that does not square with my recollection of the case, and I didn't remember that it says that in the complaint. What I do know, Your Honor, is that Mr. Calderonero sued me in the commonwealth superior court, and the matter was fully adjudicated in front of me. He sued me for breach of contract, legal malpractice, and breach of fiduciary duty, and it was heard and fully adjudicated by Judge Enos, who is now an associate justice of the commonwealth supreme court. It was heard and fully adjudicated, and judgment was rendered in my favor. Did you say small claims court? I think he did file it as a... No. In the superior court of the commonwealth, I don't remember whether it was filed as a regular civil action or as a small claims case. And this is a judge-court-of-defense trial, correct? That's correct. So, in order for him to prevail against you, he would have had to show that your representation fell below an acceptable standard of conduct, A, and B, that there was precedence from that. That's right. That's what he would have had to show. I'm sorry, what else would he have to show? I was just saying, he would have had to show that by a preponderance of the evidence, not by higher theory convincing evidence that applies to any particular cases. So, is there any record of how the trial court ruled in that case as to the performance component versus the damages component? In other words, prejudice, for example? In other words, did the trial court say, well, you performed up to standard and there was no prejudice, or did they say you didn't perform up to standard but there was no prejudice? I don't recall exactly, and I'd have to actually have to ask for the recordings to be sure, because he ruled from the bench. But he did not, it wasn't a judgment based on there being no damages. It was a judgment that was based on Mr. Campanella's failure to prove any of his causes of action by a preponderance of the evidence. So, what about in that related labor case that's alleged in the First Amendment complaint, where the party stipulated that Campanella's response to the motion to dismiss must be filed by April 14, 2009, and then you did not file a response to the motion to dismiss. So, the hearing officer granted the motion to dismiss with prejudice. Yes, and then after he did that, I filed a motion for reconsideration, which he denied. And there's only two things that I can say about that labor case. First of all, that was my fault. Error on my fault. I missed a deadline. Secondly, though, I probably never should have brought the labor case at all. I didn't have an obligation to do that, but I was kind of shocked by Judge Munson's order where he dismissed the Commonwealth law causes of action, and I was still concerned about this issue of employer responsibility for medical expenses. And so, I told Mr. Campanella that I would take on that case and take it to the Department of Labor. That was a mistake. That was, I, you know, I was a mistake, first of all, because I should have known better than to rely on Mr. Campanella for trying to bring a public interest issue forward given the infirmities that had been revealed in his claim against his employer. And secondly, it was a mistake because, obviously, I didn't have sufficient time to handle it properly, which is why I missed the deadline and tried to cure that with a motion for reconsideration, which was unsuccessful. So, in that respect, in the Conrad Merrill case, yes, this is one of those instances where I did drop the ball. But, Your Honor, I had a very, very busy practice, a very large number of clients. Yes, occasionally I did drop the ball. Occasionally I did have a calendaring error and missed a hearing. Those things shouldn't happen. I agree that they did happen. But, taken in perspective for the volume of the cases that I handled, the people that were given access to justice by my services, and the kinds of work that I did as a general rule in my cases, then, you know, like I said in my pre-hearing memorandum, it probably was appropriate to discipline me, but it certainly wasn't appropriate to disbar me, and it certainly wasn't appropriate to throw away all the strictures of due process of law in the process of coming after me. That was motivated by something else. Did you have an opportunity to raise those Commonwealth claims in the Commonwealth Court after they were dismissed in the federal court? Well, that's why I took the labor case. The labor case was the appropriate forum to bring those claims. I probably could have filed a civil action in the Commonwealth Courts. It's not exclusive, but the better rule would have been to go to the Department of Labor, and if unsuccessful at the Department of Labor, petition the Superior Court for review of the administrative decision. Let's talk about Emily Santos. Is it Garday? Gar? The divorce case? Garday, yes. Gard? Yes. Garday? Yeah. Garday, by the way, was her married name, so once the divorce was concluded, she became again Emily Santos. All right. So, now it says that you, in 2008 she hired you, but it also says that due to lack of diligence by you, the divorce wasn't granted until three years later or so, 2011. Yeah, well, you know, that's one of the things that troubled me about the First Amendment complaint, which actually I had planned to file a motion to dismiss rather than answer, but then missed the deadline and we had that whole default thing. But that's a conclusory statement, and there's actually no factual basis for that allegation that Mr. Clifford put in there that the complaint took that long due to lack of diligence. It took that long because Emily Santos Garday's case was a sensitive matter for reasons that I don't want to get into, and she didn't have any problem with the fact that it took that period of time before we had the divorce hearing and Judge Enos granted the divorce from the bench. Her problem, the reason why she went to the bar and made a complaint, was that I never pursued through the, and I don't recall exactly when I gave it to the court, but I didn't follow through on her written divorce decree, and she needed it and wanted it, and so there was an inappropriate delay between the time that she was actually divorced by the judge and the time when she had her actual decree, and the dates are there. Anyway, the date that Judge Enos granted the divorce, and the decree is also there in the record, so there's that gap, and that was me being overextended and not following through on getting her written decree the way that I should have. Honor Reyes and Esperanza Ellis are complicated cases, and the reason they went and made, as the Esperanza Ellis declaration reveals, it was the pressure of the transition to federal immigration control in the Commonwealth that prompted them to go to Mr. Ellis because they needed to get green cards to secure their status. They needed to secure their status before November 28, 2009. That was their concern, and that was the concern of a great many people in the Commonwealth, a great many foreign workers in the Commonwealth at that time, a large number of which were knocking on my door for assistance with regard to that. Both cases were valid cases. Self-petitioned I-360 for spousal abuse, green cards, domestic violence situations, different in nature, and actually I had completed one I-360 for Mr. Ellis, and it went through the entire process, which Honor may not know, but it regularly takes years to get a final decision on a VAWA application, and it went through, and ultimately the Vermont Service Center denied that application, and they argued that she hadn't made out some certain points. There's like four or five points I don't remember right now, but that's without prejudice to reapplying, and so that's what we did on the second round. We reapplied, and I needed a statement from her describing the whole situation that had occurred with her husband, and she did provide me with that statement. The problem was it was somewhere between 20,000 and 30,000 words, I think, Your Honor, and not that well written, and so I had told her that we needed to rework that because nobody was going to read that and decide that if she was going to get a denial again, and that was basically the point that we were at. But I was trying to help her to rework that at this time when we had everybody being concerned about immigration matters, and I was trying my best to accommodate all the ones that I had accepted, and her case and Esperanza Ellis' case both fell into that category. Now, with regard to Esperanza Ellis, there are many false statements in the first amendment complaint, and her declaration responds to those false statements, so it's pretty clear on what's wrong with that based on her declaration, and I have to stand on her declaration with regard to that case. What do you have to say to the charge by the judge that it was self-serving, that it reads like it was prepared by you? Well, of course it was prepared. I understand that, but let's just focus on self-serving. Well, see, that's the thing. What does he mean by self-serving? Does he mean that it's self-serving because it defends me and I'm the one who wrote it? That doesn't make sense. There's no legal rule that says something like that. The question is, what is within the four corners of the declaration? What are the assertions of fact that the declaration makes? Now, the declaration obviously isn't self-serving, at least to my eyes, to Ms. Ellis, and of course it's beneficial to me or intended to benefit me or it wouldn't have been supplied to the court. The point is, what does that declaration say about the integrity of the charges, of the allegations in the first amendment complaint? And what it says is that there's a problem there, and so it supports the meritorious defense. All right, now we've asked, and I don't want to spend much time on that. I'm satisfied with that. How about Invictus Feliciano? Okay, Invictus Feliciano is another case where it was fully tried before Judge Enos, and Judge Enos rendered a decision, and there's actually a copy of the judgment in the record. I had supplied that to Janet King, and then later on I had communicated with Mr. Bellis saying, why are you doing this? Why are you referring this case for prosecution? No, I don't remember. I think it was before they referred it, but I said, why is this? I don't remember exactly, but anyway, I had asked him, and Mr. Bellis' response was, I don't know anything about a judgment. Well, it had been supplied, okay, and then I put it into the record. But even beyond that, there's absolutely no merit to the Feliciano complaint. None. Zero. And Judge Munson, for whatever reason, I probably should have filed a judicial misconduct complaint, because Judge Munson just flew off the handle and held against me the fact that I had been trying to reschedule the trial in the Feliciano case because there was this very urgent matter in the Superior Court involving the TRO and wrongful taking of a poker establishment on Rota, and Judge Clemento wasn't able to have a hearing on the TRO in short order, and it was going to be more than a month out. And this actually is a poker establishment on Rota that ultimately ended up as part of a big case in the district court here that led to the disbarment of Mr. Kichuchu for his involvement in that wrongful taking of the poker establishment on Rota, which, if Judge Munson had agreed to get me to reschedule the Feliciano case, I might have been able to prevent in the Superior Court in front of Judge Clemento. And so in one of his orders, Judge Munson referred to the fact that I had been vigorously trying to get the court to agree to continue the Feliciano case and insisted that that was evidence that I just wasn't prepared. No, that's evidence that I'm doing my job for my clients the way that I'm supposed to do it. I was not there at trial for medical reasons because of vertigo and dizziness that I had the night before, and I went to the ER, and the doctor at the ER instructed me to come back at 9 a.m. the next morning to the hospital. And he gave me an excuse slip, which, when I first filed with the court, the copy of the excuse slip inadvertently wasn't attached, and then later on it was attached. And I had notified my secretary to make the appropriate contact about my inability to be there at that hearing. And all of this is actually documented in the record, in that case, in this court. But Judge Munson simply refused to credit anything that I said, and it was documented in the medical record that was there. But he simply said, no, you're not prepared. No, I was prepared. And that Saturday before the hearing, in my office, I met with the witnesses that were Mr. Feliciano. It wasn't going to be a long trial. It was a very simple trial. Less than half a day. It was a very weak case, as well. But the other side had refused to settle for anything more than $500, so what choice did we have? Had to go to trial. My attorney's fees in that case for Mr. Feliciano, a grand total of $300 for everything that I did. And it ends up being like the lead case for an argument that I should be disbarred. It's actually so pretty obvious. You started out by saying that you fully litigated that case. Did I miss something? Yes, you did. The complaint, the Feliciano complaint. Mr. Camarnero and Mr. Feliciano both filed cases against me in the Superior Court. Both cases were heard by the same judge in the Superior Court. And I won judgments in both cases. Right. And the allegations were exactly the same in both cases. Each was a breach of contract, each was fiduciary. But Judge Monson dismissed that lawsuit with prejudice for failure to appear? That's correct. And what about, there's also an allegation that you had been sanctioned for failure to appear for court-ordered settlement conferences. Is that correct? Settlement conference, status conference, or whatever. There were a few occasions at different times and in different cases where, and including in the Feliciano case, I had missed... I had, it wasn't a settlement conference though. Because we had the settlement conference. And the other side did not offer more than $500. They were very stubborn on that. But, unless I'm mistaken, it wasn't a settlement conference. But I did miss one scheduled appearance in the Feliciano case prior to the time when Judge Monson dismissed. And he sanctioned me for that. Judge Monson's policy was that if an attorney missed a scheduled hearing, that attorney was required to pay the attorney's fees for the time spent by opposing counsel to appear at the hearing. And I always thought that that was a fair policy. And I'm by far not the only attorney who's ever been sanctioned under that policy for failure to appear. Some of the most prominent attorneys on the island have also been sanctioned in that same way. Okay. What about G. M. Lee? Yes. That one, I advert to Ms. Lee's declaration, which was not available at the time of the motion to set aside entry of default. Because I hadn't had an opportunity to meet with her and discuss it yet. And she's coordinated. Her son was always her interpreter. And when we did do the declaration, she took a great deal of time to review it carefully with her son. And I think she made some changes before we finally did it. But as to the facts and responding to the complaint, those are in Ms. Lee's declaration. And the last is Chan Suk Kim. Oh, yes. This is the one where she's got the immigration matter relating to her son, which involves sending his son an adoption decree. Okay. Here's the story that they came to me. The son, when he was young, was adopted by, I think it was the uncle, I think it was the brother of the mother, who was a U.S. citizen. Mr. Kim and his mother, both at that time were Korean citizens. So the uncle adopted them. And based on the adoption, the uncle secured a green card for Michael. And when they came to me, they're saying, can we get USCIS to change their records? Can we undo the adoption or something like that? So the son had ultimately gotten his citizenship. And the mother wanted the son to petition her for a green card as his mother, except that she wasn't his mother anymore because of the adoption decree. That was fundamentally what it turned out that the situation was. And I asked him about his relationship with the uncle, and then two of them were saying, well, you know, the uncle wasn't really good to him, and there's not really a father-son kind of relationship between them and all like that. You know, really, can we just get this adoption decree undone and restore the mother's status to being the mother so that he can petition for her? That was the situation. And they paid me. I said, OK, well, I looked into it, but it doesn't look good. And they paid me $1,000, and it's reflected in their receipt that I'm going to research that and try to determine if there's a way to do that. Possible design of a remedy. There were three things. And it's right there on their receipt. And that's what they paid me $1,000 for. And I did that work. And then later on, some months later, they came back to meet with me with regard to the findings. And I had a Korean language interpreter that I used for all of those meetings. And I explained to them the whole situation. I explained to them the findings. And I explained to them that if we try to set aside the adoption decree, it's almost impossible to do. It's not likely to happen.  And they said, well, you just try anyway. And I said, well, for that, you have to pay additional attorney's fees. That's a substantial amount of additional work. And that's how they ended up filing a complaint against me, because they didn't want to pay for my work to take the next step. They wanted the whole ballgame for the $1,000 that they paid in the first place, which is totally inadequate. I spent at least 10 hours working on that case, looking into the matter on their behalf, for $1,000. That's 50% discount on the attorney's fees already. All right. Let's move to the first amendment complaint. So I've seen the document, the first amendment complaint. I see that footnote, footnote 1, right there on page 1, that says you have 10 days of service. And I guess my question to you is, we're on the line here. You already know that there's been this interim proceeding. They're out to get you. Here you get this document. How could you miss seeing that you had 10 days and that you needed to save your career, do whatever you had to do? I didn't miss it, Your Honor. But I didn't have the date written down. And it wasn't there. And when I pulled it up to check it, and looking for the date on there, where's the date? Okay. And the main thing there, Your Honor, was the complete chaos in my office that had been created by the interim suspension. I was still trying to get clients filed, trying to help guide them for what they can do because I wasn't able to represent them anymore. I was trying to get all my clients to receive copies of the interim suspension order because that was one of my obligations under the order. And I had all these ongoing immigration cases that I was still responsible to handle in a professional manner in the immigration court. And as my calendar that had been submitted to the Supreme Court in the interim suspension case, with the intent of showing them how much prejudice would be caused to my clients if I were dismissed, shows exactly how busy my immigration calendar was at that point in time. And these were cases scheduled for individual hearings on withholding of removal claims. So, they're not simple matters. And so, that was the situation. And then the day that I emailed Mr. Clifford asking him about what the date was, and Your Honor, I've never had an experience in 20 years of practice like the one I had with Mr. Clifford with regards to that inquiry. Never has a opposing counsel stonewalled me if I email them and ask them about the deadline or something else. But that's what Mr. Clifford did. Maybe partly because he's a conflicted attorney or whatever. But his excuses that he gave in the transfer to the court, they're not legitimate excuses. Either for proceeding in the manner that he did, or for refusing to agree to set aside the default. There's really no reason why Mr. Clifford should not have agreed to set aside the default. He said that he probably had real doubts about whether he was going to prove his case, which is why he did that. But this is a disciplinary complaint, Your Honor. I find it very hard to justify refusing to allow an attorney to be heard on the merits in a disciplinary case. Yeah, if I had been... There are cases, there's lots of cases in the reports, if you go out there and look at it, where one month, two months, three months after the default had been entered and the suspension or the disbarment entered, the attorney comes in and says, whoa, whoa, you know, I want to defend. All right? This is not what we're talking about here. I emailed Mr. Clifford one or two days. No, I emailed, I think it was the day after the day that Mr. Clifford had obtained entry of default, which was the day after the deadline. And that was that fast. And then he absolutely, he just stonewalled me. Until he said, until I was served with the hearing notice for the default judgment hearing, that's when I found out that I had been stonewalled, and that's when I had a very short period of time to try to do something about setting aside the entry of default. And also, in 20 years of practice, Your Honor, I have never seen a judge treat a motion to set aside entry of default the way Judge Weisman treated my motion in this case. It was just absolutely, Judge Weisman had prejudged my case, and he essentially said so. Right there on the record, in the transcript. And there was no way that he was going to allow me to put the disciplinary counsel to their room. Did you have a hearing on this one in the district court for the common law? I did, Your Honor. And, you know, I have great respect for Judge Tadinko-Gatewood. And she's critical of me in her order, and to a degree, I accept the criticism, as I accept responsibility for those things where I actually failed right here and right now. The problem with Judge Tadinko-Gatewood's decision, Your Honor, is that she's supposed to review the record of this case. Yet she colored her decision on what she's going to do by things that were entirely outside of the record, and which I never had an opportunity to argue about. She's got interpretation of rules and stuff that were never actually before the court. And it relates back to the other case that I was prosecuting in the district court here. At that time, the actions which I believe to be unprofessional conduct by the U.S. Department of Justice attorneys defending that case, anything to try to make me the issue in order to avoid the merits of the case, is not appropriate professional conduct for a Department of Justice defense attorney. I'm sorry, it's just not, okay? And they wasted almost three months on attacking me. What are you referring to? In Judge Tadinko-Gatewood's case, she makes a reference to aspects that had nothing to do with the case in the Commonwealth case, but had to do with what happened in the Long Island case, where the actions of the federal prosecutor saying that they learned, that supposedly the court only learned of the status of my case from these other things. It had to do with my petition for certiorari to the U.S. Supreme Court, where I had asked for an extension of time to file the petition, which Justice Kennedy denied that extension, and suggesting that I was supposed to report that to the district court. Which I had not done that. And a Hawaii reciprocal discipline action, which was suggesting that I'm supposed to report a reciprocal discipline action based on the rule, which I think is clearly not the case if you apply normal rules of statutory construction to the rules that are being cited. So she got into those issues. And her order in that reciprocal discipline case here, had not set a deadline for when I was supposed to respond. So I don't think that I was in violation of any of my duties in connection with that. Yet she seemed, in her decision, to be influenced by those things. Which had actually been arguments that had been created by Judge Monson, not Judge Monson, but Judge McGlumya, and government counsel in the other case that I'm talking about. And also the other thing that Judge Tedinko-Gatewood did, that I think influenced the decision, was she had a very narrow conception of what constitutes due process. And that was very clear from the very beginning of the hearing. So it's basically like, you're served with the complaint, yes. And you missed it, and it defaults, and so on. That's the end of the question. Which I think that the question about due process has a lot, involves a lot more than that. Under due process, you have to have a meaningful opportunity to be heard. You can't have judges that have prejudged your case. You can't have conflict of disciplinary counsel. You can't have soldiers that follow the disciplinary rules by the court and by the disciplinary committee. And all of those other factors. Those things have to be satisfied in order for you to have due process. But her conception of due process was very, very narrow. So those are the two things that I noticed from her order. And, you know, it probably would have been, if I had given earlier notice of the exact status of my case to her, that probably would have been better. But basically I was just doing your job, Your Honor, and there wasn't an order that said that I'm supposed to do something by a date certain. So I didn't ignore, I don't feel that I ignored any of my duties in connection with reporting or with other typical disciplinary process. Let me make an observation, Mr. Woodruff, which maybe doesn't fit precisely within the three-part test here, but I think it's a concern that I have about your practice generally, and that is there's an alarming number of instances where you miss deadlines. I know this can happen from time to time to anybody, but the number of instances that I've seen is alarming. In this case, missing the First Amendment complaint. What you already conceded about dropping the ball in a couple of, at least a couple of cases that were in election, the First Amendment complaint. The failure in the Supreme Court to file a timely brief, or file a timely appendix. I'll leave aside the question of the format of the brief. I don't view that as being particularly big beyond shock that the court did not accept that brief. I find that really remarkable. But then in the district court, the judge mentioned that he missed a deadline to file a memorandum in opposition to imposing reciprocal discipline. Another missed deadline. And we've already addressed the question about the petition for a writ of certiorari. Then in these proceedings, in our court, you fail to file at least one timely status report in this case. You receive an order to show cause why you should not be sanctioned for failing to prosecute three other cases in this case that were moving on. So, I'm just wondering if there's some, is there an issue that you have with timeliness that explains this pattern that I just laid out for you of quite a large number of instances. I was a practicing attorney for seven years before I got this position. And it was always something that was in the back of my mind that I couldn't possibly have a situation where I would miss a deadline. I have to file a motion for extension of time. Sometimes that's necessary. But I would never let a deadline pass. But there are many instances that I've already set out. And this even leaves aside all the allegations in the first line of the complaint of failure to communicate, which is a related, it's distinguishable, but a related issue. So, do you have any explanation for why there's this, you know, number of instances of default? Well, first of all, I completely agree with you, that those are valid concerns. And they're very much concerns of mine. And I realize that I ended up in this pickle because of those concerns, if we get down to the rock bottom. There are several things that I can say with regard to that. And part of it was my own habits, in the sense that I'm keeping track of my calendar and keeping a lot of stuff in my head instead of having that reinforced adequately by my staff. And I did not always have the greatest staff, for one thing, because I had a low-budget, shoestring-budget office because of the type of clientele that I was trying to serve. And my colleague who said that I was trying to do too much for too many for too little was absolutely right. And, yes, I found it difficult to refuse people in need that I felt had meritorious claims or issues that were of public importance. But I agree that that needs to be corrected. If I had somebody really reliable on top of those aspects of scheduling and so on, then I don't think it would ever happen, which that's one factor. And it's my responsibility to make sure that I have somebody like that. Unfortunately, I didn't. Now, the second factor is that during most of that period, actually from 1998 until 2003, I was actually a victim of domestic violence. My spouse was constantly doing terrible things that disrupted a lot of things. It's kind of hard when your suits get cut up with scissors and so on. And I don't really want to get into that, but Judge Wiseman had some awareness of that but ignored that because actually there was one trial, when I came to trial, a jury trial on the first day of trial, and I asked to meet with him in chambers because I got no sleep at all the night before because of the domestic situation. And Judge Wiseman said, well, the jury's here. Let's go ahead and see how it goes. And I actually did that trial. I tried that trial, one week-long criminal trial. And as Judge Wiseman even admitted in the transcript, all of my trial work was good. And so I completed that. But I was so concerned about the situation of coming to defend in a criminal case that I had to ask to meet with Judge Wiseman and embarrass myself by admitting what that situation was. That's finished. That's gone. And I'm with someone who's actually good and helpful and supportive with regard to my law practice. My spouse before was actually regularly undermining my law practice and trying to make business and professional decisions for me. And I had huge arguments time and time again about the responsibility of an attorney not to let someone else direct their actions. So that was one factor that influenced my overall efficiency and productivity. But the largest factor was the too much for too many for too little problem. And as I said, you know, probably I needed a good wake-up call. I certainly got it. Getting hit by a truck like I did in this instance in a rather unfair way isn't really a very appropriate or good way to give me a wake-up call. But I certainly got the wake-up call. And as of right now, I will see what— because I'm going to file some kind of motion with Judge Technical Gatewood. I'm going to see what, if anything, can be done about that. But I have a number of cases in the Ninth Circuit right now. And those are important cases. Except for the Ramsey case and the Noble case, those cases are all staying by Your Honor's order at present. When the stay was put in place, I had actually gotten from the Department of Justice the Attorney's Agreement to extensions of time and I was about to file the appropriate motions. But then I didn't file them because the cases were staying. At the very minimum, Your Honor, and I commit this question to your sound discretion, but at the very minimum, Your Honor, I want to prosecute those appeals and petitions to their conclusion. If the court determines that the Ninth Circuit needs to put restrictions on my practice before this court, that is committed to your discretion. But I think if I'm allowed to continue to practice without restriction, if the court declines to disbar or suspend me, that I can do a very helpful job to the court, that I can fulfill my functions as an officer of the court in a way that is helpful to the court and beneficial to the public interest. That's what my concern is, Your Honor. And I'm very much aware, Your Honor, that in the future I have to ensure that my practice of law is conducted impeccably. Before I wrap up, one detailed question. Was the reply brief filed in the Supreme Court, the one you sent to us, in the Commonwealth Supreme Court? Yes, I would think so. Do you happen to have the docket number in front of you? I don't have it. Looks like it's... I don't see a docket number. Wait, wait, wait. 30. 2013-SBC-0030. So I meant the 9th Circuit docket number, the docket number where I filed it in this court, from the top. I'm not sure that we got it from your file. We may have gotten it directly from the CNMI Supreme Court. Because they didn't accept all of your... They didn't accept all of your brief, and they didn't accept the excerpts because they were late filed. But what about the reply brief? The reply brief, I believe, was filed on... Yes, in fact, the reply brief was filed on time. I remember now that... And if you have it, and if I didn't submit it into the records, and you have it, then you must have pulled it from them, which would mean that they accepted it. But I had filed for an automatic extension of time of 30 days for the reply brief, and the clerk denied that. And one of the issues that I had with the way that I was treated by the CNMI Supreme Court was the way that they're interpreting the rules against me. Construe all the rules against Woodruff, a kind of secondary rule, because I don't read the rule the way that they read the rule in order to say that I can't get an extension of time on the reply brief because I have an extension of time on the opening brief. It's very different than Ninth Circuit practice, certainly. So they denied the extension of time, and as a result of their denying the extension of time, I just tied up the reply brief and filed it. That's what my record of that sentence is. And so I finally filed the reply brief, even though I'd asked for the extension, and they denied it. I believe that's the case. It also shows it was filed at 11.57 p.m. That would mean that I finally filed it, because I'd beaten in my dead body. So you no longer can practice in any court in the commonwealth. You can no longer practice in Hawaii. You can't practice in the immigration court or at the Board of Immigration Appeals. So if you were able to continue practicing in the Ninth Circuit, what do you envision your practice would look like? What volume of practice would you have? Well, that depends, Your Honor, on what I'm able to do from a business standpoint. And I don't have a business plan for that yet. But I have expertise in immigration, so I may be able to get additional immigration petitions for review. And I do have these other... If somebody wanted an appellate lawyer for a decision that they didn't like out of the district court here, then I could do it. I don't think that that would be a big practice, but you know, Your Honor, I'm used to living on a shoestring, especially right now after being hammered and losing my office and so on. So an appellate practice is a type of practice that I don't need a large office in order to be able to do it. But I would make known that my services are available and do what those issues are. I have a petition for a re-hearing and I'm standing within that circuit right now in an unanswered case, so I don't know what's going to happen then. So my role at this stage is to prepare a report of recommendation which would be sent to you. You would have an opportunity to file objections. And then that report, with your objections, would go to a panel. So I could recommend that the court impose reciprocal discipline, which every other court has done. You've looked at this. Or I could say the court shouldn't impose reciprocal discipline and leave you unaffected. Or I could take an intermediate approach and I could say, well, there may be some issues about the validity of the proceeding, but there's certainly, based upon what you've said in the record, there's certainly cause for concern such that it may not be appropriate to allow Woodruff unrestricted practice of law. So maybe a period of probation or a period of suspension may be an intermediate approach. So what thoughts do you have as to that possibility? Well, for the most part, Your Honor, I commit that to your discretion. I've presented my arguments and you have all the papers and I'm sure you look at them very closely. Of course, I don't think that reciprocal discipline of this bar should be imposed. And I prefer not to be restricted, but I can well understand where the court can have a concern and would think it appropriate to do something different. And I would appeal to the court if we were going to restrict my practice in this court to impose the minimum restrictions that you believe are sufficient to accomplish the purpose. I don't think that we need severe restrictions. I would not object, Your Honor, to a three-month or a six-month suspension from bringing any new appeals or petitions or other actions in this court as an attorney. That would be one way to go. I'm only thinking off the top of my head. I don't know where your thoughts would lead you. I do know that even Judge Taniko Gatewood's order in the district court here permits me to apply for reinstatement within two years. I think I'm going to ask her to modify that order somewhat, but I haven't made a final decision in that regard yet. And that is one factor. And the commonwealth Supreme Court rule is five years on disbarment, but if we count it from February 1st of 2013, that would be only next March when I could apply for reinstatement. But that's not clear from the commonwealth's orders where the clock is supposed to start. And I'm also doubtful that the commonwealth courts will ever allow me to be reinstated. They don't seem to have... I could be wrong, but my impression from the way that I've been treated is that at least certain judges don't like me. Did you have a hearing with respect to the Hawaii reciprocal proceedings? No, I had actually... Under their rules, it was similar to the procedure here, and I had the best opportunity to be heard, and I had submitted copies of their record and some memos and so on, but the Hawaii court surprised me, and they issued that two-page order just basically summarily saying that I had not met my burden and citing three cases that were entirely in a positive, in my opinion, to my case. One of the three cases they cited can't even be found. They can't find it on Westlaw, can't find it on the Hawaii Supreme Court website. That's the oldest one of the three cases that they've cited. And the other two cases were disciplinary actions where the attorney did not oppose. And, of course, I had opposed. So, and I never... I'm not sure why they did that one. I disagree with it, of course, but I never actually practiced in Hawaii. I went to law school in Hawaii. I took the bar exam in Hawaii, so my first license is from Hawaii, but I came out here to work as counsel to the Senate of the Commonwealth Legislature because they had called me back for it to do that. And so I immediately went on inactive status in Hawaii and I did on inactive status from that time onward because I never actually went back to Hawaii and practiced there. I don't have any more questions, Mr. Woodruff. Do you have any other questions of me? I don't think so, Your Honor. We've covered a lot of territory and so there's nothing that pops out in my mind right now that needs to be expressed. If you want me to submit that declaration that I had prepared with regard to the nefarious conduct of Mr. Dulles, I can do that. But you may not think that's particularly important. Well, I'll give you a week to send that in, file it within a week. Okay, okay. Thank you. Yes. And subject to that submission, this matter will be submitted for purposes of preparing a reporting recommendation and you will receive notice when that is filed. You have an opportunity to respond. So before I leave off, I don't know if the person who's doing the tech work in the Commonwealth is on the line, but I wanted to express my appreciation for the cooperation we've had from the court staff there in making this hearing possible. And with that, the hearing is matter submitted and thank you for appearing today. And Your Honor, I have to say it's a pleasure to actually see her face. I've seen many appellate commissioner orders, but I've never had a face to attack me before. I hope it's not too shocking for you. Okay, thank you. Bye-bye. Thank you. This court for this session stands adjourned.
judges: Appellate Commissioner Shaw